# Exhibit A

**SUMMONS - CIVIL**
JD-CV-1   Rev. 2-20
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a, 52-48, 52-259;
P.B. §§ 3-1 through 3-21, 8-1, 10-13

| | |
|---|---|
| **For information on ADA accommodations, contact a court clerk or go to: www.jud.ct.gov/ADA.** | STATE OF CONNECTICUT **SUPERIOR COURT** *www.jud.ct.gov*  |

**Instructions are on page 2.**

- [ ] Select if amount, legal interest, or property in demand, not including interest and costs, is LESS than $2,500.
- [x] Select if amount, legal interest, or property in demand, not including interest and costs, is $2,500 or MORE.
- [ ] Select if claiming other relief in addition to, or in place of, money or damages.

**TO: Any proper officer**
By authority of the State of Connecticut, you are hereby commanded to make due and legal service of this summons and attached complaint.

| Address of court clerk *(Number, street, town and zip code)* | Telephone number of clerk | Return Date *(Must be a Tuesday)* |
|---|---|---|
| **121 Elm Street, New Haven 06510** | ( 203 ) 789 – 7492 | 12/01/2020 |

| [x] Judicial District | G.A. | At *(City/Town)* | Case type code *(See list on page 2)* |
|---|---|---|---|
| [ ] Housing Session | Number: | | Major: **M**    Minor: **90** |

**For the plaintiff(s) enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(if attorney or law firm)* |
|---|---|
| Carey & Associates, P.C., 71 Old Post Road, Suite One, Southport, CT 06890 | 420084 |

| Telephone number | Signature of plaintiff *(if self-represented)* |
|---|---|
| ( 203 ) 255 – 4150 | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book. [x] Yes [ ] No | E-mail address for delivery of papers under Section 10-13 of the Connecticut Practice Book *(if agreed)* eswedock@capclaw.com |
|---|---|

| Parties | Name *(Last, First, Middle Initial)* and address of each party *(Number; street; P.O. Box; town; state; zip; country, if not USA)* | |
|---|---|---|
| **First plaintiff** | Name: Thomas Bezilla<br>Address: 42 Billow Road, Niantic CT, 06357 | P-01 |
| **Additional plaintiff** | Name:<br>Address: | P-02 |
| **First defendant** | Name: Henry Schein, Inc.<br>Address: 101 N Plains Industrial Rd, Building #3 Unit D, Wallingford, CT 06492 | D-01 |
| **Additional defendant** | Name:<br>Address: | D-02 |
| **Additional defendant** | Name:<br>Address: | D-03 |
| **Additional defendant** | Name:<br>Address: | D-04 |

| Total number of plaintiffs: 1 | Total number of defendants: 1 | [ ] Form JD-CV-2 attached for additional parties |
|---|---|---|

## Notice to each defendant

1. **You are being sued.** This is a summons in a lawsuit. The complaint attached states the claims the plaintiff is making against you.
2. To receive further notices, you or your attorney must file an *Appearance* (form JD-CL-12) with the clerk at the address above. Generally, it must be filed on or before the second day after the Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to appear.
3. If you or your attorney do not file an *Appearance* on time, a default judgment may be entered against you. You can get an *Appearance* form at the court address above, or on-line at https://jud.ct.gov/webforms/.
4. If you believe that you have insurance that may cover the claim being made against you in this lawsuit, you should immediately contact your insurance representative. Other actions you may take are described in the Connecticut Practice Book, which may be found in a superior court law library or on-line at https://www.jud.ct.gov/pb.htm.
5. If you have questions about the summons and complaint, you should talk to an attorney.
   **The court staff is not allowed to give advice on legal matters.**

| Date | Signed *(Sign and select proper box)* | | [x] Commissioner of Superior Court | Name of person signing |
|---|---|---|---|---|
| 11/13/2020 | | | [ ] Clerk | Elizabeth W. Swedock (430889) |

| If this summons is signed by a Clerk: | For Court Use Only |
|---|---|
| a. The signing has been done so that the plaintiff(s) will not be denied access to the courts. | File Date |
| b. It is the responsibility of the plaintiff(s) to ensure that service is made in the manner provided by law. | |
| c. The court staff is not permitted to give any legal advice in connection with any lawsuit. | |
| d. The Clerk signing this summons at the request of the plaintiff(s) is not responsible in any way for any errors or omissions in the summons, any allegations contained in the complaint, or the service of the summons or complaint. | |

| I certify I have read and understand the above: | Signed *(Self-represented plaintiff)* | Date | Docket Number |
|---|---|---|---|

RETURN DATE: December 1, 2020

| | |
|---|---|
| THOMAS BEZILLA, | : |
| Plaintiff, | :   SUPERIOR COURT OF |
| | :   JUDICIAL DISTRICT OF |
| | :   NEW HAVEN |
| v. | : |
| | : |
| HENRY SCHEIN, INC., | :   **JURY TRIAL DEMANDED** |
| | : |
| Defendant. | :   November 13, 2020 |

## COMPLAINT

Plaintiff Thomas Bezilla (hereinafter "Plaintiff") by and through his undersigned counsel Carey & Associates, P.C., files this Complaint against the Defendant Henry Schein, Inc. ("Defendant" or "HSI"). Plaintiff alleges as follows:

## I.  PRELIMINARY STATEMENT

1.  Plaintiff asserts claims for: (1) unlawful age discrimination pursuant to the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(b); (2) intentional infliction of emotional distress; (3) negligent infliction of emotional distress; and (4) breach of the covenant of good faith and fair dealing.

## II.  JURISDICTION, VENUE & PARTIES

2.  This action is authorized and instituted pursuant to Conn. Gen. Stat. § 46a-60 *et seq.*

3.  At all times relevant to this action, Plaintiff, currently age 54 (DOB ##/##/1966), is and has been a Connecticut resident, residing in in Niantic, Connecticut.

4.  At all times relevant to this action, Defendant, incorporated in Delaware and headquartered in Melville, NY, has a branch office located at 101 North Plains Industrial Road,

1

Building #3 – Unit D, Wallingford, CT  06492.  Defendant is the largest provider of health care products and services to office-based dental and medical practitioners.  Plaintiff was employed by Defendant in its Wallingford office.

5.      Defendant is subject to the personal jurisdiction of this Court.  All of the allegations made herein occurred within the territorial jurisdiction of the Connecticut Superior Court Judicial District of New Haven.

## III.    **PROCEDURAL PREREQUISITES**

6.      On July 8, 2020, Plaintiff filed a "dual charge" of discrimination against Defendant with the United States Equal Employment Opportunity Commission ("EEOC") and the Connecticut Commission on Human Rights and Opportunities ("CHRO"). A copy of the dual charge was sent to the Defendant on the same date.

7.      On August 14, 2020, the EEOC issued a Notice of Right to Sue regarding charge number 523-2020-01624.  **(Exhibit A).**

8.      On November 10, 2020, the CHRO issued a Release of Jurisdiction regarding Complaint number 2130089. **(Exhibit B).**

9.      All administrative prerequisites to the institution of this action have been satisfied.

## IV.    **STATEMENT OF FACTS**

10.     Plaintiff was employed as a Field Sales Consultant ("FSC") in the Dental division of Defendant, which division sells equipment, merchandise, computer equipment, software and practice management consulting.  He was employed as an FSC with Defendant for a little over twenty-nine (29) years until his termination on April 24, 2020.  He has worked in the dental sales industry for more than thirty-three (33) years.

11.     In 1987, Plaintiff began working in dental sales for American Dental in Baltimore Maryland. He was subsequently moved to Connecticut to work for that company. In 1991, Sullivan Dental purchased American Dental.

12.     After the purchase, the CEO of Sullivan Dental, Bob Sullivan, stated that if Plaintiff remained with the company, it would retain the Connecticut branch office and grow and develop it.  Plaintiff agreed to stay and worked extremely hard to help to build up and grow that office.

13.     In 1997, Sullivan Dental was purchased by Defendant.  Up until that acquisition, Defendant was a mail order company.  With its purchase of Sullivan Dental, Defendant became the largest distributor of dental equipment, supplies and services in the world.

14.     At about that same time, Defendant also purchased Smith Holden, Inc., the longest operating dental supply company in the country.  As a result, Plaintiff reunited with all of his former colleagues from American Dental who had left and gone to work for Smith Holden. Subsequently, Defendant swallowed up most of its competitors in New England.

15.     At this point, Plaintiff had in excess of 150 accounts, all of which he had obtained through very hard work. For many years, he was the number one sales representative in the Connecticut branch office and won numerous sales awards at Defendant's national sales meetings.

16.     At Defendant, an FSC could either be assigned accounts by a manager or the FSC could obtain accounts on his/her own.  However, it was next to impossible to obtain accounts on one's own because Defendant essentially had a monopoly on the dental supply industry so that a doctor's office was more likely than not already its customer or a customer of a competitor of Defendant.

3

17.     As a result, in addition to accounts obtained on his/her own, each FSC relied on managers assigning available accounts to him/her in order to meet sales projections and to earn commissions.  Consequently, it was imperative that a manager's assignment of accounts (as they became available through resignations, retirements, etc.) be fair and impartial.

18.     However, for the most part, that was not Plaintiff's experience working for Defendant beginning in 2001 when Jeff Trachtenberg became his manager to the date of his termination when Rebecca Byrne was his manager.  When assigning accounts, most of Plaintiff's managers never understood the meaning of fairness or objectiveness or impartiality.  The only manager who grasped the meaning of fairness was Steve Hoyt.

19.     Mr. Trachtenberg became the Connecticut branch manager in 2001.  He is about 30 to 35 years old and had zero experience as a manager.  Prior to coming to work for Defendant, he worked as a manufacturer representative.

20.     In point of fact, Mr. Trachtenberg was a nightmare as a manager, so much so that during his first year as manager, the other FSCs, including Bob Kawicki, Tom Lentini, Mike Gantos and Rich Foti, tried to persuade Plaintiff to join them in ousting Mr. Trachtenberg as manager.  Unfortunately, Plaintiff declined and would come to unquestionably regret that decision years later when Jeff Trachtenberg would be solely and directly responsible for his losing over $600,000 in annual sales.

21.     Plaintiff remained the number one sales representative until 2011 when, because of Jeff Trachtenberg's questionable management style and his greed, Plaintiff lost that top ranking and his four top customers.

22.     In 2011, Mr. Kawicki retired.  Instead of redistributing Mr. Kawicki's territory to the FSCs, Mr. Trachtenberg retained that territory for himself, even though he was not an FSC at

4

the time.  When Plaintiff would inquire into when Mr. Kawicki's accounts would be reassigned,

Mr. Trachtenberg would tell him that he was in the process of hiring a new FSC to take over

those accounts.  Plaintiff found out later that that statement was a lie.  Defendant continued and

maintained the ongoing discriminatory practice throughout this time period, which continued

until Plaintiff's termination.

23.     At about this time, Plaintiff had four customers, whose accounts he had managed

for over twenty (20) years.  Those customers were his top accounts, each doing over $160,000 to

$200,000 in sales annually for merchandise plus $50,00 to $100,000 in equipment purchases

each.

24.     Due to the poor and shabby treatment each customer received from Mr.

Trachtenberg, each of those clients left Defendant.  For example, he would set up countless

meetings with those customers for issues they were having and never bothered to show up or

call.  He also never responded to numerous messages left for him regarding issues they were

experiencing at the time.

25.     As a result of Mr. Trachtenberg's treatment of those customers, each of those

customers subsequently informed Plaintiff that they were leaving Defendant.  They each placed

their reasons for leaving squarely at the feet of Jeff Trachtenberg.  Each did not understand the

callous treatment of top customers of Defendant and no longer wanted anything to do with

Defendant.  Consequently, Mr. Trachtenberg singlehandedly cost Defendant hundreds of

thousands of dollars in sales and cost Plaintiff hundreds of thousands of dollars in sales

commission.

26.     In 2012, Mr. Lentini passed away and a couple of FSCs left Defendant.   The

accounts of those individuals, therefore, had to be reassigned to other FSCs. Instead of

reassigning those accounts, Mr. Trachtenberg retained all of them. He did not reassign a single account to the FSCs. At that point, Mr. Trachtenberg could have assigned accounts to Plaintiff to compensate him for the $600,000 loss in annual sales he had cost Plaintiff, but he chose not to do so. Defendant continued and maintained the ongoing discriminatory practice throughout this time period, which continued until Plaintiff's termination.

27.     Instead of supervising the FSCs and addressing customer issues as he was being paid to do, most of Mr. Trachtenberg's time was spent amassing accounts and putting together his multi-million dollar territory. He was going behind the backs of the FSCs and accumulating accounts instead of assigning them to FSCs. Mr. Trachtenberg took over 60 accounts from Plaintiff (in addition to the 4 large accounts he cost Plaintiff). Ultimately, Mr. Trachtenberg put together a $4,000,000 plus sales territory for himself, even though he was not an FSC.

28.     At that point, Plaintiff was handling 75 to 85 accounts, way down from the 150 accounts that he usually serviced. In his eleven 11 years as the branch manager, Mr. Trachtenberg never assigned a single account to Plaintiff. Defendant continued and maintained the ongoing discriminatory practice throughout this time period, which continued until Plaintiff's termination.

29.     Mr. Trachtenberg was a branch manager who engaged in duplicitous conduct, not caring about the impact it was having on either the sales and/or morale of the FSCs. Mr. Foti and Mr. Gantos went to upper management and reported the unethical activities of Mr. Trachtenberg. As a result of their complaints, they were assigned accounts, but management never directly addressed (in any way) the problem: Jeff Trachtenberg.

30.     Plaintiff brought the matter to the attention of Tim Sullivan, who offered to speak to Mr. Trachtenberg on his behalf. However, fearing repercussions from Mr. Trachtenberg,

6

Plaintiff declined Mr. Sullivan's offer.  Out of the blue one day, the FSCs learned that Mr.

Trachtenberg was leaving his position as manager to become an FSC.

31.     In or about 2012, Steve Hoyt, became the branch manager.   Unfortunately, he

died about a little over a year into his position.

32.     In or about 2014, Mike Malloy became the next manager of the branch.  Mr.

Malloy, who is between 30 and 35 years old, was hired as a rookie technology specialist and then

became the branch manager.  He was not qualified to be a manager and, like Jeff Trachtenberg,

did a shoddy job.

33.     Plaintiff realized very quickly that Mr. Malloy (like Rebecca Byrne, the current

manager) was more focused on and concerned with securing his job by any means instead of

doing what was right and fair for the FSCs he supervised.  That is to say, each time accounts

became available to be reassigned, he did not fairly assign the account sequentially so each

representative would receive a large account.  Instead, Mr. Malloy (like Ms. Byrne) assigned

those accounts to substantially younger sales representatives.

34.     Because that was the criteria for assigning accounts, Plaintiff never received a

large account (*i.e.*, more than $5,000 in sales per year) for the entire 29 years that he was

employed by Defendant. Each time he requested a larger account, Mr. Malloy would string him

along by telling him things like he has Plaintiff's back, or he will take care of him.  Plaintiff

never received a single one of those accounts. Defendant continued and maintained the ongoing

discriminatory practice throughout this time period, which continued until Plaintiff's termination.

35.     In or about 2016, Mr. Malloy became the branch manager of the Boston branch

office.  At that time, Rebecca Byrne became the branch manager of the Connecticut office. Ms.

Byrne is incapable of communicating with her direct reports without vulgarity and profanity and

7

is the most unqualified and unprofessional manager (with the exception of Jeff Trachtenberg) with whom Plaintiff has ever worked. She was also an absent branch manager as she never came into the Wallingford office but preferred to work from home.

36.     Her absence in the office became problematic when it became nearly impossible to get a hold of Ms. Byrne when Plaintiff was faced with a crisis by Defendant's customers that required an immediate managerial response. On those occasions, Plaintiff would call Ms. Byrne who, more often than not, would respond to his call by texting him and requesting that he text her the issue. Most times the issue was too voluminous to be texted and, as stated, needed immediate action by management. Plaintiff also had to deal with many profanity-laced responses regarding ongoing or unresolved issues with customers, which clearly served no purpose and did not resolve the issues. In fact, it became tedious and made it next to impossible for Plaintiff to effectively do his job.

37.     For example, Plaintiff went to Ms. Byrne with a crisis involving Dr. Kevin Cross, his biggest customer and a valued customer of Defendant. After repeated issues with his Planmecca Scanner, Plaintiff once again went to Ms. Byrne and told her that Dr. Cross was getting more and more upset with the unresolved issues. In response, she screamed at Plaintiff: "you tell Dr. Cross, if he doesn't fucking like what we did for him, he can go pound fucking sand." That response was completely unacceptable as it did not resolve Dr. Cross' issues and her language was entirely unacceptable and inappropriate.

38.     Plaintiff, however, felt like he had no recourse but to put up with Ms. Byrne's egregious behavior. That is because, Jeff Blair, the Northeast zone manager and Ms. Byrne's supervisor, would have taken no action against her and would have gone out of his way to protect her from any ramifications of her bad behavior.

8

39.     Furthermore, Mr. Blair continuously engaged in bullying behavior and tactics himself that intimidated his subordinates so much that it prevented them from filing complaints with HR about the conduct of either Ms. Byrne or Mr. Blair. Plaintiff believed everyone feared losing their jobs and opted instead to put up with the bullying and the disrespect.

40.     Prior to Ms. Byrne's tenure as manager, the office always had monthly "review calls" to review each FSC's top accounts and bottom accounts to determine what, if anything, could be done to increase business. When Ms. Byrne became manager, Plaintiff never received a single account review call. Instead, she openly admitted at sales meetings that "she was not good with numbers/math."

41.     As noted, Ms. Byrne never apportioned accounts between the FSCs fairly but assigned accounts based on what was in her best interest and how she would benefit the most. Several FSCs ended up leaving Defendant when they realized how difficult it was to get new customers/business.

42.     Throughout the entire time, she assigned about fifteen (15) accounts to Plaintiff, none of which generated yearly sales of more than $5,000.  She funneled the larger accounts to the substantially younger employees ("rookies"), with little to no experience, instead of to someone like Plaintiff with over 30 years of experience. At that point, Plaintiff was servicing approximately 65 accounts. Defendant continued and maintained the ongoing discriminatory practice throughout this time period, which continued until Plaintiff's termination.

43.     A stark example of Ms. Byrne's ineptitude as a manager involved Edward Chiffer, an FSC that also worked out of the Connecticut branch office and Plaintiff's friend.  Mr. Chiffer was 69 years old.  At all relevant times, Ms. Byrne was aware that Mr. Chiffer and

Plaintiff were friends.  In fact, she would not have approached Plaintiff if she were not aware of that fact.

44.     Beginning in or about December 2018, Ms. Byrne began trying to convince Plaintiff to persuade Mr. Chiffer to retire.  She had approached him directly to try to pressure him into retiring, but, because he was not ready to retire, he had refused.

45.     Ms. Byrne approached Plaintiff five to six times to ask him to encourage Mr. Chiffer to retire.  She had a transition agreement prepared that would result in Mr. Chiffer's resignation from the company.  On one occasion she stated to Plaintiff that she had tried to get Mr. Chiffer to take the transition deal but he would not, so she demanded that Plaintiff convince Mr. Chiffer to take it.

46.     Each time she requested that Plaintiff speak with Mr. Chiffer, Plaintiff told her that he was extremely uncomfortable doing anything of the sort, but she persisted and came back to him several more times with the same request.  Plaintiff did not understand the push to get rid of Mr. Chiffer and he felt her pressuring him to make someone do something they did not want to do was completely inappropriate.

47.     Each time she approached Plaintiff with more urgency to get Mr. Chiffer out of the company.  Her sense of urgency escalated, and her tirades would become more laced with profanity to exhibit her frustration with Mr. Chiffer's refusal to retire.

48.     Plaintiff never tried to convince Mr. Chiffer to retire or to accept any deals. Plaintiff did, however, inform him of the interactions he had had with Ms. Byrne. The final time Ms. Byrne approached Plaintiff was in January 2020. It was very clear that Mr. Chiffer was being targeted because of his age. As someone who was over 50, Plaintiff was genuinely concerned with Ms. Byrne's fixation with age and what that meant for his future with the

company. He did not have long to wait to find out. Defendant continued and maintained the ongoing discriminatory practice of forcing older employees to retire, which continued until Plaintiff's termination.

49.     On February 5, 2020, Plaintiff had a meeting with Rebecca Byrne at a Starbucks in Middletown, Connecticut. During the meeting, he had to sit and listen to her screaming about Toby Hamp, a technology specialist, who turned out to be unqualified and unwilling to service Plaintiff's customer accounts. In a profanity laced tirade, Ms. Byrne repeatedly rebuked Mr. Hamp stating that he was not following up with anyone else customers either.  She was also upset that he was costing Plaintiff at least $500,000 in equipment sales.  Mr. Hamp had refused to follow up with countless leads generated by several FSCs (including Plaintiff) and close sales.

50.     Ms. Byrne then stated: "I've fucking had it with that asshole and I've started the paperwork to have him fired." In response Plaintiff stated: "I wonder if Toby's lack of concern to do his job has to do with him getting high." Without a second of hesitation, Ms. Byrne snapped at Plaintiff saying: "What the fuck does smoking marijuana have to do with anything? I get high almost every day, and if you say anything, I will deny it.  I have ways to pass a pee test if HR made me do one and you won't have a job." Plaintiff felt sufficiently intimidated, threatened and chastised and did not repeat to anyone that Ms. Byrne regularly did drugs.

51.     As more large accounts became available and Plaintiff became aware of them, he would constantly plead with Ms. Byrne to give him the next big account that came up.  She always refused saying she had to "take care of her rookies" (whom she had hired less than a year prior).  Defendant continued and maintained the ongoing discriminatory practice throughout this time period, which continued until Plaintiff's termination.

52.     After she had hired three substantially younger employees ("rookies") (and

funneled the large accounts to them), Plaintiff heard that she was hiring a fourth substantially

younger employee ("rookie").  He was concerned because her practice had become assigning all

the large accounts to the substantially younger employees ("rookies") and she would not assign a

decent account to Plaintiff.  He asked why she would hire yet another substantially younger

employee ("rookie"). Ms. Byrne responded that "corporate wanted a higher body count."

Plaintiff asked her what her remark meant and why would corporate continue to insist on hiring

substantially younger employees ("rookies") when accounts could be assigned to experienced

FSCs like Jake Mastel, Judy Cooke, Ed Chiffer or Plaintiff.  He did not receive a response.

53.     As managers and the individuals who assigned accounts, Jeff Trachtenberg, Mike

Malloy and Rebecca Byrne had complete control over the success (or not) of the FSCs in the

office.  Each of them could have opted to do the right thing and apportion the accounts fairly

thereby allowing all the FSCs to succeed and thrive in the company.  The success of FSCs could

only help, not hurt Defendant.

54.     Instead Defendant chose to divvy up the accounts based on favoritism and self-

interest to the exclusion of substantially older other FSCs, like Plaintiff, who had busted their

butts for many years for the company.  Ms. Byrne, in particular, chose to give significant

accounts to substantially younger employees ("rookie") FSCs, thereby sacrificing the ability of

older FSCs, like Plaintiff, to meet sales projections and to earn commissions.  Defendant

continued and maintained the ongoing discriminatory practice throughout this time period, which

continued until Plaintiff's termination.

55.     On April 15, 2020 (his birthday), while Plaintiff was on a hike with his 4 year old

daughter, he received a phone call from Ms. Byrne.   She informed him that Jeff Blair and Kim

McDonough from HR were also on the call. Jeff Blair then stated: "Due to COVID-19, sales are down nationwide, and doctors are not able to pay their bills. As a result, your job has been eliminated. Do you have any questions?" The stated reason for the termination was pretextual or not the real reason; Plaintiff's age was the substantial motivating factor and/or but for factor for his unlawful termination.

56.     Plaintiff was completely and utterly shocked because he never saw his dismissal coming. He managed to find his voice and observed how cold Mr. Blair was acting towards him as a dedicated and loyal employee of 29 years. Plaintiff told him that he did not understand the way he was being treated. Plaintiff thought everyone was heartless and unfeeling on that call and was beyond disgusted by it. They made him feel like a piece of garbage that was being tossed out. It took them precisely 2 minutes and 20 seconds to callously upend Plaintiff's entire life.

57.     Immediately after the call and while he was still in shock, Plaintiff called Ms. Byrne. On that call, she actually said to him: "Tom, you'll actually make out better on unemployment with the extra $600 a week." Plaintiff could not believe she said that to him. He failed to comprehend how anyone could be so disconnected from reality, especially his so-called manager, to say something so ignorant after he was just fired from a job where he had given the company 29 years of dedicated service. Her response reinforced Plaintiff's belief that she had zero experience in a supervisory capacity as she was totally oblivious to the fact that this was Plaintiff's life and career.

58.     On or about April 22, 2020, Plaintiff spoke with Dave Steck, the President of HSI Dental and Tim Sullivan, the former HSI Dental President. They informed him that Defendant would be "keeping most if not all rookies nationwide." This was a direct statement from an officer of the company and bound the Defendant to this statement against interest, that older

employees were terminated and substantially younger employees were retained nationwide, not just in Connecticut.

59.     That statement completely explained why the only FSCs terminated were over 50 while all the substantially younger FSC "rookies" (all under 30 years old) were retained.  In point of fact, Plaintiff's termination had nothing to do with COVID-19 but had everything to do with the fact that he is 54 years old.

60.     Finally, the statement admits that Defendant had engaged in a continual pattern and practice, going back several years, wherein the Defendant favored substantially younger employees because of and substantially because of their age and that they were cheaper to employ.  That same practice continually stripped Plaintiff and others similarly situated from earning income because Defendant gave all new clients to substantially younger employees, i.e. the "rookies".

61.     On May 11, 2020, Plaintiff received a Severance Agreement from Defendant. Pursuant to that Agreement, he was terminated due to "job elimination" and April 24, 2020 was his termination date.  The Severance Agreement (among other things) required that Plaintiff release all claims, known and unknown, that he may hold against Defendant and provided for severance payments over a 26-week severance period. The Severance Agreement also imposed a Non-Compete, Non-Solicitation and Confidentiality Agreement (that was supposedly attached as Exhibit C but was not) and incorporated a Confidentiality Agreement that Plaintiff had signed and was dated February 12, 1999.  Plaintiff refused to sign the agreement.

62.     Separate and apart from the fact that Plaintiff was illegally and unlawfully terminated because of his age, he was absolutely disgusted with how unprofessionally and

callously he was treated. It was clear that his 29 years of faithful and dedicated service meant

nothing to Defendant and the company clearly did not believe in rewarding loyalty.

63.     It also became clear that Ms. Byrne's practice of hiring rookies and funneling

significant accounts to them instead of to Mr. Chiffer, Ms. Cooke, Mr. Mastel or to him

exhibited a clear animus for older employees. The pressure she placed on Plaintiff to convince

Mr. Chiffer to retire also supported that view. Plaintiff's age was also the reason she failed to

assign accounts to him, despite repeated requests. At that point, it would not have made sense to

assign accounts to employees whose time with the company was extremely limited.

64.     Plaintiff's customers, on the other hand, respected and rewarded loyalty and

excellent service. A number of them, upon hearing the shocking news of his termination,

responded initially with shock which quickly turned to anger due to the horrendous treatment

Plaintiff had received. Several customers sent emails directly to Stan Bergman, the CEO of

Defendant, and to management, including Rebecca Byrne and Jeff Blair, protesting the

unfairness of his termination. Each of those customers informed Plaintiff that they received no

response from the company.

65.     Having his employment of more than 29 years so callously taken from him has

wreaked havoc on Plaintiff's mental and physical health. He has experienced sleeplessness,

depression, anxiety, loss of appetite, weight loss, hopelessness, mood swings, agitation and

irritability. As a result, his physician has placed him on medication to control (among other

things) depression and daily anxiety attacks.

66.     As stated, only four employee's jobs were terminated by "job elimination." All of

them are over 50 years old (69, 62, 54 and 50). Somehow, COVID-19 and customer inability to

pay only impacted the jobs of the FSCs over 50 but mysteriously kept intact the jobs of the four

FSCs in their 20s. The age discrimination could not be any more blatant or reprehensible.

67.     Plaintiff lost his job of 29 years substantially because of his age. Stated plainly,

Defendant began unlawfully favoring substantially younger "rookie" FSCs and making clear that

Plaintiff was obsolete. That fact was made clear by the clear preference for the substantially

younger "rookie" FSCs through, among other things, favorable account assignments. Any

explanation given by Defendant to the contrary is pretextual and contrived. Defendant should be

held accountable for engaging in unlawful discrimination practices.

68.     On July 8, 2020, Plaintiff filed his dual charge of employment discrimination

with the EEOC, alleging, among other things, age discrimination.

## V.     CAUSES OF ACTION

## COUNT ONE:        DISCRIMINATION BASED ON AGE PURSUANT TO THE CFEPA

69.     Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through

68, inclusive, as though fully set forth herein.

70.     Plaintiff, age 54 (DOB ##/##/1966), was at all relevant times qualified to perform

his job duties and had been employed in the dental sales industry for more than thirty-three (33).

71.     At the time Plaintiff became an employee of Defendant, he had in excess of 150

accounts and was the number one sales representative in the Connecticut branch office until

2011. Plaintiff also had won numerous sales awards at Defendant's national sales meetings.

72.     Despite repeated requests, Plaintiff had to deal with not one, but three managers

who consistently refused to give him accounts. He was usually given pretextual and baseless

reasons for their failure to do so. Instead, managers would take accounts from him and not

replace them, thereby increasing the chances that he would be unable to meet his sale

projections. Defendant would continually award new accounts to the substantially younger employees, i.e. the "rookies".

73.     Plaintiff was subjected to a series of continuous, offensive and discriminatory acts engaged in by Defendant as described herein, including, but not limited to, failing to assign accounts to him and taking accounts from him while consistently and overwhelmingly assigning accounts to substantially younger FSCs or "rookies," attempting to use him to convince Edward Chiffer to retire from the company, after being unable to directly do so and setting up Plaintiff for failure, all substantially because of his age.

74.     Defendant's failure to assign Plaintiff accounts resulted in Plaintiff's inability to meet his sales volume number which consistently led to poor work performance evaluations, which evaluations were then used against Plaintiff to disingenuously justify his termination based on "job elimination."

75.     His interaction with Ms. Byrne seeking to remove Mr. Chiffer from the company made clear to Plaintiff that Defendant was not looking out for and had no desire to retain older employees.

76.     That conclusion was reinforced by the managers refusal to assign Plaintiff accounts, including Ms. Byrne's refusal because she had to "take care of her rookies," and Dave Steck and Tim Sullivan's statement to Plaintiff that Defendant would be "keeping most if not all rookies nationwide," a direct admission of Defendant's corporate wide discriminatory age bias.

77.     Therefore, Defendant's actions including funneling significant accounts to substantially younger "rookies" while assigning no accounts to its older workforce exhibited a clear animus for older employees and were motivated by illegal discriminatory bias.

78.     Plaintiff was terminated for the pretextual reason of "job elimination" because of his age, effective April 24, 2020.  At least three (3) people's jobs were terminated on that basis, all of whom are over 40 years old (69, 54 and 50).

79.     Plaintiff's termination constituted an adverse employment action.

80.     Defendant had no legitimate basis for the adverse employment action committed and any reasons asserted for the adverse action are pretextual or false.

81.     Defendant's adverse employment actions occurred under circumstances giving rise to an inference of age discrimination.

82.     Defendant exhibits a clear and unmistaken preference for substantially younger employees over older employees like the Plaintiff.  Plaintiff was denied equal treatment in the terms, conditions and privileges of his employment, substantially because of his age in violation of the CFEPA.

83.     Plaintiff was treated differently than similarly situated employees who were younger than him substantially because of his age.

84.     Plaintiff was unlawfully terminated in violation of CFEPA substantially because of his age.

85.     Plaintiff respectfully requests that Defendant be held liable pursuant to the CFEPA on this claim and requests all appropriate relief be awarded in his favor.

**COUNT TWO:          INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

86.     Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 85, inclusive, as though fully set forth herein.

87.     Plaintiff can successfully establish a prima facie case of intentional infliction of emotional distress against Defendant by showing that: (1) Defendant knew or should have

18

known that emotional distress was a likely result of its discriminatory conduct towards Plaintiff;
(2) Defendant's callous, offensive and discriminatory conduct was extreme and outrageous; (3)
Defendant's intentional discriminatory conduct resulted in Plaintiff's wrongful and unlawful
termination, which termination resulted in severe distress to Plaintiff; and (4) Defendant's
conduct caused Plaintiff extreme and severe emotional distress.

88.     Plaintiff was a dedicated and faithful employee of Defendant for over 29 years.
For many of those years, he was the number one sales representative in the Connecticut branch
office and received numerous accolades for that feat.

89.     Plaintiff was also a loyal employee.  He remained loyal to the company even after
Mr. Trachtenberg disrespected and neglected his largest customers causing them to leave the
company and costing Plaintiff (and the Defendant) hundreds of thousands of dollars in sales.

90.     His loyalty remained steadfast when managers took accounts from him and
funneled them to younger sales associates.  Similarly, he remained loyal when managers refused
to assign accounts to older, more experienced FSCs but unreservedly assigned them to the
rookies or younger employees.  Plaintiff never questioned his commitment to Defendant despite
all the incidents of age discrimination he had been subjected to and had witnessed.

91.     After enduring all of the foregoing, Plaintiff's unwavering loyalty and dedication
are repaid by an abrupt, callous and cold telephone call terminating his employment of over 29
years and being told that he would "make out better on unemployment."

92.     As a result of the foregoing, Plaintiff experienced and continues to battle severe
physical, emotional and mental conditions including sleeplessness, depression, anxiety, loss of
appetite, weight loss, hopelessness, mood swings, agitation and irritability.  Those conditions
overwhelmed Plaintiff to the point where he was compelled to seek medical intervention where

he was placed on prescription medication to battle (among other things) depression and daily anxiety attacks.

93.     The conduct engaged in by Defendant was egregious, extreme and outrageous.

94.     Working in an environment where he was denied accounts because of his age, which impeded his ability to properly make a living, has had and continues to have an adverse toll on Plaintiff.  His unjustified termination only added to the physical, emotional and mental toll that he had been experiencing through the years of working for Defendant.

95.     Defendant intentionally caused Plaintiff's distress, had a reckless disregard for the substantial probability that its conduct would elicit such distress and knew that severe emotional distress was the likely result of the conduct in which it engaged.

96.     Consequently, Plaintiff's emotional distress resulted directly from Defendant's discriminatory treatment of him because of his age.

97.     Plaintiff respectfully requests that Defendant be held liable on this claim and requests all appropriate relief be awarded in his favor.

**COUNT THREE:   NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

98.     Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 97, inclusive, as though fully set forth herein.

99.     Plaintiff can successfully establish a prima facie case of negligent infliction of emotional distress against Defendant by showing that: (1) Defendant's conduct created an unreasonable risk of causing Plaintiff emotional distress; (2) Plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness and (4) Defendant's conduct was the cause of Plaintiff's distress.

100.     Defendant's persistent and pervasive conduct and treatment of Plaintiff was intentional and so severe that Defendant should have known that it would result in extreme emotional distress, and in fact it did result in Plaintiff's extreme emotional distress.

101.     Defendant should be held liable for negligent infliction of emotional distress on Plaintiff.

**COUNT FOUR:**      **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

102.     Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 101, inclusive, as though fully set forth herein.

103.     Defendant acted in bad faith when, it intentionally acted to injure Plaintiff's right to make a living.

104.     Through the actions of one manager, Plaintiff lost hundreds of thousands of dollars in sales, and therefore substantial sales commission.  That manager was never disciplined for that specific offense or for the subsequent pilfering of FSCs' accounts in which he engaged to form his multi-million dollar territory.

105.     Plaintiff was never made whole for the loss of those customers, as his managers refused to assign accounts to him or older FSCs, but had no problems funneling numerous accounts to substantially younger employees.  According to one manager, she had to "take care of her rookies."  Extending the climate that showed stark favoritism to rookies, Defendant then got rid of only FSCs over 50 years old.

106.     Without sufficient accounts, Plaintiff could not earn commissions and could not meet the sales projection requirement, which was viewed as a failure attributable to Plaintiff.

107.     Although Defendant was the impetus for Plaintiff's failure to meet the projections, Defendant nevertheless acted in bad faith and with a dishonest purpose when it used

that failure as the basis for terminating Plaintiff.  Rather, Defendant engaged in dishonest, unscrupulous and discriminatory conduct which resulted in Plaintiff's termination because of his age.

108.    Consequently, Defendant acted in bad faith and with a dishonest purpose when it cited "job elimination" as the basis for terminating Plaintiff.

109.    Defendant, therefore, breached the covenant of good faith and fair dealing.

110.    Plaintiff respectfully requests that Defendant be held liable on this claim and requests all appropriate relief be awarded in his favor.

## VI.    **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff hereby requests the following relief:

A.    Award compensatory damages;

B.    Award punitive damages;

C.    Award attorneys' fees and costs;

D.    Award pre-judgement interest;

E.    Award post-judgement interest;

F.    Award such other relief in law or equity as this Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff respectfully requests a jury trial on all questions of fact raised by his Complaint.

Respectfully Submitted,

THOMAS BEZILLA,
PLAINTIFF

By:

Mark P. Carey (413729)
Donna-Marie J. Woodstock (408080)
Elizabeth W. Swedock (430889)
Carey & Associates, P.C. (420084)
71 Old Post Road, Suite One
Southport, CT 06890
(203) 255-4150 tel
(203) 255-0380 fax
mcarey@capclaw.com
djwoodstock@capclaw.com
eswedock@capaclaw.com
HIS ATTORNEYS

A TRUE COPY
ATTEST:
NICOLE BAKER
CONNECTICUT STATE MARSHAL

23

RETURN DATE: December 1, 2020

| | | |
|---|---|---|
| THOMAS BEZILLA, | : | SUPERIOR COURT OF |
| | : | JUDICIAL DISTRICT OF |
| Plaintiff, | : | NEW HAVEN |
| | : | |
| v. | : | |
| | : | |
| HENRY SCHEIN, INC., | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendant. | : | November 13, 2020 |
| | : | |

## <u>STATEMENT OF AMOUNT IN DEMAND</u>

The matter in demand, exclusive of interest and costs is greater than FIFTEEN

THOUSAND ($15,000.00) DOLLARS.

Respectfully Submitted,

THOMAS BEZILLA,
PLAINTIFF

By:
Mark P. Carey (413729)
Donna-Marie J. Woodstock (408080)
Elizabeth W. Swedock (430889)
Carey & Associates, P.C. (420084)
71 Old Post Road, Suite One
Southport, CT 06890
(203) 255-4150 tel
(203) 255-0380 fax
mcarey@capclaw.com
djwoodstock@capclaw.com
eswedock@capaclaw.com
HIS ATTORNEYS

A TRUE COPY
ATTEST:
NICOLE BAKER
CONNECTICUT STATE MARSHAL

# EXHIBIT A

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Thomas Bezilla<br>42 Billow Road<br>Niantic, CT 06357 | From: | Boston Area Office<br>John F. Kennedy Fed Bldg<br>15 New Sudbury Street, Room 475<br>Boston, MA 02203 |
|---|---|---|---|

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |  |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 523-2020-01624 | Hanh N. Nguyen,<br>Investigator | (617) 565-3205 |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

| | |
|---|---|
| [ ] | More than 180 days have passed since the filing of this charge. |
| [x] | Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge. |
| [x] | The EEOC is terminating its processing of this charge. |
| [ ] | The EEOC will continue to process this charge. |

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

| | |
|---|---|
| [x] | The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost. |
| [ ] | The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time. |

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*[signature]*

**Feng K. An,**
**Area Office Director**

August 14, 2020

*(Date Mailed)*

Enclosures(s)

cc:

HENRY SCHEIN, INC.
101 North Plains Industrial Road
Building # 3 - Unit D
Wallingford, CT 06492

Mark Carey
CAREY & ASSOCIATES, P.C.
71 Old Post Road, Suite One
Southport, CT 06890

STATE OF CONNECTICUT
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

Thomas Bezilla
**COMPLAINANT**

CHRO No. 2130089
vs.                                          EEOC No.  523-2020-01624

Henry Schein Inc
**RESPONDENT**

## RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint.  The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides.  If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served.  Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

**DATE:**   November 10, 2020          Tanya A. Hughes, Executive Director

Service:
Complainant:  Thomas Bezilla
Complainant's attorney:  mcarey@capclaw.com
Respondent:  Henry Schein Inc.
Respondent's attorney: lalexander@littler.com